UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


BRENNAN'S, INC.                                          PLAINTIFF


VS.                              CIVIL ACTION NO. 3:06CV694TSL-JCS


BERT CLARK BRENNAN AND
BLAKE W. BRENNAN                                         DEFENDANTS


<u>MEMORANDUM OPINION AND ORDER</u>

     Plaintiff Brennan's, Inc., which owns the famous Brennan's

restaurant in the French Quarter in New Orleans, filed this

lawsuit on December 8, 2006 against Bert Clark Brennan and Blake

W. Brennan asserting causes of action for trademark infringement

and dilution under the Lanham Act, 15 U.S.C. §§ 1114 and 1125©),

and seeking an injunction against defendants' use of what

plaintiff contends is a substantially similar name, "Clark and

Blake Brennan's Royal B," on restaurants which defendants are

planning to open soon in Destin, Florida and Ridgeland,

Mississippi, and perhaps other locations, as well.  Following a

period of limited discovery, the case came on for hearing before

the court on Brennan's motion for preliminary injunction pursuant

to Rule 65 of the Federal Rules of Civil Procedure.  The court,

having considered the evidence presented and arguments of counsel,

concludes that plaintiff's motion should be denied.[1]

_____

     [1]     Prior to the hearing, defendants moved to exclude the
testimony of plaintiff's expert, Kenneth Germaine.  At the start

As stated, plaintiff owns and operates Brennan's restaurant, located at 417 Royal Street, in the French Quarter.  Brennan's restaurant was started in 1946 by Owen E. Brennan, Sr., and is currently owned in roughly equal parts by Owen Brennan's three sons, Owen (Pip) E. Brennan, Jr., Theodore (Ted) M. Brennan and James (Jimmy) Brennan.  The defendants, Bert Clark Brennan and Blake W. Brennan, are Pip's sons.  For a period of about ten years beginning in April 1995, Clark and Blake were employed as general managers of the restaurant.  However, on May 6, 2006, both sons tendered their resignations.  As it happened, prior to formally tendering their resignations, Clark and Blake had been making plans to open restaurants of their own, a fact which was learned by Pip, Ted and Jimmy not long after defendants resigned.[2]  Pip,

---

of the hearing, the court indicated that this motion would likely be granted, and the court now holds that this motion is granted for the reasons assigned in the defendants' motion.  Defendants had also moved to consolidate the hearing on the motion for preliminary injunction with the trial on the merits, or alternatively, to consider this as a summary judgment motion.  The court announced that the motion to consolidate was denied, but made no ruling with respect to the alternative request for summary judgment.  Plaintiff requested an opportunity to respond to defendants' motion in this regard, and that opportunity will be granted.  Accordingly, the court reserves ruling on this aspect of defendants' motion to consolidate.

[2]     Defendants' decision to strike out on their own came after a meeting with their father and uncles in June 2005 in which their uncles made it clear to them in no uncertain terms that they would never have an ownership in Brennan's and never be anything other than employees of Brennan's.  When Katrina hit and destroyed both defendants' homes a couple of months later, they relocated to Jackson temporarily, and eventually made the decision to make the move permanent.

Ted and Jimmy first discovered that Clark and Blake, through a company they had formed, B.3.G., LLC, had filed an intent-to-use trademark application with the United States Patent and Trademark Office for the name "Brennan Brothers" in international Class 043 for "restaurant services."  However, Brennan's, Inc. owned the registered service mark "Brennan's" in international Class 043 for "restaurant services," and therefore, through counsel, sent Clark and Blake a cease and desist letter advising that use of the name "Brennan Brothers" was unauthorized, would cause confusion and would infringe upon plaintiff's "Brennan's" mark.

Although the Patent and Trademark Office denied defendants' application for the mark "Brennan Brothers,"[3] Clark and Blake subsequently filed a second intent-to-use trademark application on August 31, 2006 for the name "Clark and Blake Brennan's Royal B." Upon learning of this second application, Brennan's, Inc. again advised defendants that use of this name was unauthorized, would cause confusion and would infringe upon the "Brennan's" mark. Brennan's, Inc. then filed this suit, alleging that defendants' unauthorized and intentional use of the name "Clark and Blake Brennan's Royal B," or any other name incorporating the "Brennan's" mark for restaurant services, in Brennan's established

---

[3]     The initial denial was indicated to be based on the examiner's search results which indicated the possibility of confusion with other marks using the name Brennan.  A second decision was issued reflecting the examiner's denial based on the fact that the proposed name was "primarily a surname."

consumer base and market area will unlawfully confuse and mislead customers into believing that defendants' proposed restaurants are sponsored by, affiliated with, and/or related to Brennan's, and the goodwill associated with the "Brennan's" mark.  Brennan's seeks an injunction pursuant to 15 U.S.C. § 1116 to prohibit defendants from using any name, similar to or incorporating the federally registered "Brennan's" mark or any variation thereof, prohibiting defendants from engaging in unfair competition by offering services substantially similar to services offered by Brennan's and associated with Brennan's restaurant, and prohibiting them from selling, displaying, using or advertising of services under the federally registered "Brennan's" mark or any variation thereof.[4]

To obtain a preliminary injunction, a plaintiff must establish each of the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that it will suffer irreparable injury absent the injunction; (3) that the threatened injury outweighs any harm the injunction might cause the defendants; and (4) that the injunction will not impair the public interest.  Enrique Bernat F., S.A. v. Guadalajara, Inc., 210 F.3d 439, 442 (5th Cir. 2000) (citing Sugar Busters L.L.C. v. Brennan, 177 F.3d 258, 265 (5th Cir. 1999)).  For the

---

[4]     In addition to the "Brennan's" mark, plaintiff also owns the mark "Breakfast at Brennan's" and the chanticleer rooster. Neither of those is at issue herein.

reasons that follow, the court concludes that plaintiff has failed to establish a substantial likelihood of success on the merits, or any of the other requisites for injunctive relief.

Likelihood of Success on the Merits

"The Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers.  National protection of trademarks is desirable, Congress concluded, because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation."  Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 198, 105 S. Ct. 658, 663 (1985).  Thus, trademark law prohibits the use of "a mark which so resembles a mark . . . when used on or in connection with the goods of the applicant to cause mistake, or deceive. . . ."  15 U.S.C. § 1502(a).

To prevail on its claim of trademark infringement, plaintiff must show that the "Brennan's" mark is protected and that defendants' use of the mark creates a likelihood of confusion in the minds of potential consumers as to the "source, affiliation, or sponsorship" of defendants' restaurants.  See Westchester Media v. PRL USA Holdings, Inc., 214 F.3d 658, 663–64 (5th Cir. 2000); see also 15 U.S.C. §§ 1114(1), 1125(a)(1)(A).  Here, it is undisputed that the "Brennan's" mark is protected.  Brennan's has

5

been using the "Brennan's" mark since the 1950s and the trademark

was granted in 1973.  Moreover, since plaintiff has used the

"Brennan's" mark continuously since its registration, the

"Brennan's" mark is incontestable, meaning, among other things,

that it is conclusively presumed to have acquired secondary

meaning.[5]  The focus of the inquiry in this case is therefore on

whether defendants' use of "Brennan's" in the name of their

restaurants creates a likelihood of confusion in the minds of

potential customers as to the source of defendants' products

and/or services.  See Sugar Busters LLC v. Brennan, 177 F.3d 258,

264 (5th Cir. 1999).  When evaluating a claimed likelihood of

confusion, the courts consider the following nonexhaustive list of

factors, known as the "digits of confusion":

    (1) the type of trademark allegedly infringed,

    (2) the similarity between the two marks,

    (3) the similarity of the products or services,

    (4) the identity of the retail outlets and purchasers,

    (5) the identity of the advertising media used,

    (6) the defendants' intent, and

    (7) any evidence of actual confusion.

---

[5]     A registered mark in continuous use for five
consecutive years after registration, and still in use, becomes
incontestable.  See 15 U.S.C. § 1065.  The registration
constitutes "conclusive evidence" of the right to use the mark,
and forecloses any challenge that the mark has not acquired
secondary meaning.

<u>Elvis Presley Enterprises, Inc. v. Capece</u>, 141 F.3d 188, 194 (5th Cir. 1998).  "No single factor is dispositive, and a finding of a likelihood of confusion does not require a positive finding on a majority of these 'digits of confusion.'" <u>Id</u>.  The court may also consider other relevant factors in determining whether a likelihood of confusion exists.  <u>Id</u>.

 1. Type of Mark Allegedly Infringed.

 The degree to which a senior user's mark is entitled to protection depends on whether the mark is classified as generic, descriptive, suggestive or fanciful/arbitrary.[6]  "The stronger the mark, the greater the protection it receives because the greater the likelihood that consumers will confuse the junior user's use with that of the senior user."  <u>Elvis Presley Enter.</u>, 141 F.3d at 201 (citations omitted).  The strength of a trademark involves two

---

[6] The Fifth Circuit has explained:
 Marks fall into four categories.  A strong mark is usually fictitious, arbitrary or fanciful and is generally inherently distinctive.  It is afforded the widest ambit of protection.  A descriptive mark tells something about the product; it is protected only when secondary meaning is shown.  In contrast to the above is the suggestive mark, which subtly connotes something about the service or product.  Although less distinctive than a fictitious, arbitrary or fanciful mark and therefore a comparatively weak mark, a suggestive mark will be protected without proof of secondary meaning.  Lastly, there are generic terms, which communicate "information about the nature or class of an article or service," and therefore can never become a service or trademark.
<u>Sun Banks v. Sun Federal</u>, 651 F.2d 311, 325 (5th Cir. 1981) (citations omitted).

components:  its inherent or intrinsic distinctiveness/strength

and the distinctiveness it has acquired in the marketplace, i.e,

its commercial strength.  See Brennan's, Inc. v. Brennan's

Restaurant, L.L.C., 360 F.3d 125, 130-31 (2d Cir. 2004).

"[I]nherent distinctiveness, examines a mark's theoretical

potential to identify plaintiff's goods or services without regard

to whether it has actually done so. ... [A]cquired

distinctiveness, . . . looks solely to that recognition

plaintiff's mark has earned in the marketplace as a designator of

plaintiff's goods or services."  Id (citations omitted).

        Brennan's argues that its mark is at least arbitrary and as

such is entitled to broad protection.  Defendants, on the other

hand, argue that "Brennan's" is merely a descriptive surname, and

thus entitled to little protection.  The Second Circuit addressed

this issue in Brennan's, Inc. v. Brennan's Restaurant, L.L.C.,

another trademark infringement suit brought by Brennan's, Inc.

relating to a New York restaurant operated in the name of its

owner, Terrance Brennan's Seafood and Chop House, and held that

"[a] proper name such as Brennan's is descriptive because it does

not by itself identify a product."  Id. at 132.  That court thus

concluded that notwithstanding that the "Brennan's" mark had

attained secondary meaning through registration and use, it was

merely "a common last name" which was not "inherently distinctive"

but rather "inherently weak."  Id. at 132.  Still, the court went

on to note that "even a common name mark may warrant protection as a strong mark if it has achieved distinctiveness in the marketplace." <u>Id</u>. That is, it may achieve the status of a strong mark if plaintiff demonstrates "distinctiveness in the *relevant* market, for if the mark is not recognized by the relevant consumer group, a similar mark will not deceive those consumers . . . ." <u>Id</u>. (citations omitted).

The relevant market here is the pool of potential customers of defendants' Royal B restaurants, for it is those patrons whose potential confusion is at issue. <u>Id</u>. In the (Terrance) <u>Brennan's</u> case, the Second Circuit concluded that the "Brennan's" mark was weak in the relevant market, which was New York. Here, however, Brennan's market arguably extends to the Jackson area (which is roughly 190 miles from New Orleans), and to Destin (about 250 miles distance from New Orleans), as Brennan's advertising efforts extend into these areas. Thus, unlike New York, the "Brennan's" mark is not necessarily weak in these markets due to geographic or marketing considerations. However, an overarching factor in assessing the strength of the "Brennan's" mark is the fact that it is widely known that members of the Brennan family independently own and operate a number of famous restaurants both within and without New Orleans, many using the "Brennan's" name.

Brennan's restaurant is famous in its own right, of course, but the Brennan family of New Orleans is renowned for its

restaurants both in New Orleans and in other locations around the country.  It has been written that "Brennan" is "one of the most famous names in New Orleans culinary scene," and that the Brennan family "is responsible for fostering a culinary tradition that many regard as the epitome of New Orleans fine dining."  See Ian McNulty, The Brennan Family: A Luscious Legacy, http://www.frenchquarter.com/dining/brennans.php (last visited May 23, 2007); see also Brennan's Inc. v. Dickie Brennan & Co. Inc., 376 F.3d 356, 358-59 (5th Cir. 2004) ("As habitués of New Orleans are well aware, members of the Brennan family are uncommonly blessed with a talent for restaurateuring.").  Various branches of the Brennan family operate a total of twelve restaurants.  Ten are located in New Orleans, including Brennan's (the original restaurant in what has been referred to as the Brennan family dynasty); Mr. B's Bistro (owned by Ralph Brennan); Ralph Brennan's Bacco; Ralph Brennan's Redfish Grill; Ralph's on the Park; Dickie Brennan's Palace Café; Dickie Brennan's Steakhouse; Dickie Brennan's Bourbon House; Commander's Palace (owned and operated by Ella and Lally Brennan); and Café Adelaide.  There is also a Brennan's of Houston, owned and operated by Ella Brennan, and Ralph Brennan's Jazz Kitchen in Anaheim, California.  The names of some of these restaurants include the Brennan family name, and

some do not, but whether the name is used or not, it is widely

known that they are all operated by Brennan family members.[7]

---

[7]     In Brennan's Inc. v. Dickie Brennan & Co. Inc., 376 F.3d
356, 358-59 (5th Cir. 2004), the Fifth Circuit undertook to explain
the evolution of the Brennan family's restaurant holdings, as
follows:

> The family's first restaurant, known since the 1950s as
> Brennan's Restaurant, was opened by Owen E. Brennan, Sr.
> In time, this restaurant came to be owned 60% by Owen
> Sr.'s widow Maude and their three sons-Owen Jr., James,
> and Theodore ("the brothers")-and 40% by the brothers'
> aunts and uncles, including Richard Brennan, Sr.
> ("Richard Sr."). The family registered BRENNAN'S as a
> federal trademark, and the family opened other
> restaurants as well. A disagreement arose between the
> two sides of the family in the early 1970s, resulting in
> a partition of the family restaurant enterprise. The
> original Brennan's Restaurant went to Owen Sr.'s widow
> and sons, while the family's other restaurants went to
> the brothers' aunts and uncles.
>
>       The partition did not solve all of the
> difficulties, and the Brennan's Restaurant side of the
> family sued the other side of the family in 1976 for
> trademark infringement. The litigation came to a close
> in 1979 with a settlement agreement ("the 1979
> Agreement") and a consent judgment that defined the two
> camps' rights in the BRENNAN'S mark. Owen Sr.'s widow
> and sons received exclusive rights to the mark in
> Louisiana and all other states except Texas and Georgia,
> where Richard Sr. and his siblings held exclusive
> rights. The agreement further provided that (with some
> exceptions) no party would "open [] or operate[]" a new
> restaurant in Louisiana using the Brennan name, though
> the agreement also allowed the parties to "aid" their
> descendants' efforts to own or operate restaurants
> "under any name." Regarding future disputes that might
> arise, the 1979 Agreement stated that neither side would
> assert its trademark rights against the other for uses
> permitted by the agreement, but it also said that it did
> not bar future claims that might arise out of a breach
> of the agreement. Owen Sr.'s widow later died, and the
> three brothers continued to own and operate the original
> Brennan's Restaurant through Brennan's, Inc.
> ("Brennan's").

The question thus arises:  How strong is the "Brennan's" mark for the purpose of identifying the original Brennan's restaurant, given the number of high profile restaurants operated by members of the Brennan *family* and the notoriety of the Brennan *family* as restaurateurs?[8]  More pertinently, the question is this:  Given the connection of Brennan family members to so many restaurants, and to so many New Orleans restaurants (and New Orleans style restaurants) in particular, is a customer or potential customer of Royal B likely to confuse defendants' restaurant with the original Brennan's restaurant, as opposed to understanding that this is simply another branch of the Brennan family expanding the family's restaurant empire?[9]  In the court's view, the answer is that under these circumstances, defendants' use of the Brennan surname would not tend to create such confusion, at least in the absence of something more to suggest a connection with plaintiff's

---

[8]     Evidence was presented at trial of a billboard on the highway coming into New Orleans from the airport which advertises "The Original Brennan's Restaurant."  While Ted Brennan testified that the reference to "original" was added post-Katrina to let the public know that Brennan's was back, and was the same Brennan's it had always been, Jimmy Brennan testified in his deposition that they used "original" to describe their restaurant because "everybody and his brother was using our name on their restaurant."

[9]     Excerpts from a Zagat's (Restaurant) Survey introduced at trial reflects the breadth of the Brennan family's impact on the restaurant scene in New Orleans, stating of Dickie Brennan's Steakhouse, "the Brennan's experience brought to beef"; of Mr. B's, "another excellent Brennan joint"; of Palace Café, "another great Brennan restaurant"; and, of Ralph Brennan's Redfish Grill, "yet another French Quarter seafooder from the Brennan family."

restaurant, especially since the name of defendants' restaurant includes their first names along with their Brennan surname.  The question then becomes whether there is something more to suggest such a connection.

2.  The similarity between the two marks:

The similarity of the marks in question is determined by comparing the marks' appearance, sound, and meaning. "Even if prospective purchasers recognize that the two designations are distinct, confusion may result if purchasers are likely to assume that the similarities in the designations indicate a connection between the two users.  The relevant inquiry is whether, under the circumstances of the use," the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated.

Elvis Presley Enterprises, 141 F.3d at 201.

While Brennan's has argued that defendants' mere use of the name "Brennan's" in "Clark and Blake *Brennan's* Royal B" for restaurant services, on its face, is sufficiently similar to the "Brennan's" mark to support a finding of likely confusion, its principal argument is that defendants' use of "Brennan's" in conjunction with the term "Royal" in the proposed name could only be calculated to mislead customers into believing that defendants' restaurants are associated with, sponsored by, related to and/or somehow affiliated with the original Brennan's restaurant on Royal Street in New Orleans.  Plaintiff insists in this regard that Brennan's restaurant, which has been located on Royal Street since 1956, has become "synonymous" with Royal Street to such an extent that the restaurant is well known to the public as "Royal Street

13

Brennan's," "Brennan's on Royal" or "Brennan's on Royal Street," and the owners known as the "Royal Street Brennan's."  It maintains that defendants' use of "Royal B," which is a blatant allusion to "Royal" Street, coupled with their use of the "Brennan's" name, will lead inexorably to confusion.  Indeed, plaintiff posits that the name could only have been intended by defendants to mislead customers into thinking their restaurant is affiliated with "Brennan's on Royal" or "Royal Street Brennan's."

If Brennan's were widely known as "Royal Street Brennan's," or "Brennan's on Royal," that would obviously have a greater tendency to support a finding of similarity of the two marks than the mere use of the name "Brennan's" in defendants' mark.  In the court's opinion, however, the evidence does not support plaintiff's assertion in this regard.  Throughout the hearing and in their memoranda, plaintiff's witnesses and counsel did consistently refer to Brennan's as either "Brennan's on Royal" or "Royal Street Brennan's," and Ted Brennan, in particular, was adamant in his testimony that Brennan's has come to be known as "Royal Street Brennan's" or "Brennan's on Royal."  Beyond that, however, there is little actual evidence to support this claim. For example, there is nothing in any of plaintiff's advertising or marketing materials referring to Brennan's in this manner; rather, all references are to simply "Brennan's."  And while one newspaper article did refer to the owners of Brennan's as the owners of the

14

"Royal Street Brennan's," there are literally hundreds of other references to the restaurant in print media as simply "Brennan's."

The exemplars of the marks themselves are not similar and would not reasonably lead one to infer a connection between the parties' restaurants.  The "Brennan's" mark consists of the name "Brennan's" in simple, unadorned red script.  Defendants' mark is decidedly different.  It is more elaborate and uses different words, a different font, different colors (black and green) and different insignia.  The only similarity is the fact that "Brennan's" appears in both marks, but the use of Clark and Blake Brennan's first names identifies them as the owners and serves to distinguish theirs from the "Brennan's" marks.

3.  The similarity of the products or services:

"When products or services are noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection."  Elvis Presley Enterprises, 141 F.3d at 202.[10]  The proper focus of this inquiry is on "whether the products and services of [Brennan's] and the Defendants are similar enough to cause confusion as to source or affiliation."  Id.  Thus, it should go without saying that "'[t]he greater the similarity between products and services,

_____

[10]  While Jackson/Ridgeland and Destin are arguably in the market served by Brennan's inasmuch as Brennan's customer base is largely comprised of tourists, the parties' restaurants do not directly compete for customers.  Someone is not likely to choose to eat at Brennan's in New Orleans rather than eating at a restaurant in Ridgeland, Mississippi or Destin, Florida.

the greater the likelihood of confusion.'" Id. (quoting Exxon Corp. v. Texas Motor Exch. of Houston, Inc., 628 F.2d 500, 505 (5th Cir. 1980)).

Plaintiff maintains that the services and products defendants plan to offer are so strikingly similar to Brennan's products and services as to make it clear that defendants have essentially undertaken to replicate Brennan's, from theme to food to decor to atmosphere so as to "pass off" their restaurant as having a connection with Brennan's. Plaintiff points out, for example, that defendants' menus will include a relatively large number (more than half) of the same or similar items to those appearing on the Brennan's menu, including Turtle Soup, Grillades and Grits, Berny Potatoes, Filet Serice, Shrimp Remoulade, Oysters Rockefeller and Okra Gumbo, to name few, and also including Bananas Foster, the dish for which Brennan's is undeniably most famous (the enormously popular dessert created by a Brennan's chef Paul Blange in 1951). Moreover, defendants have described their planned Ridgeland restaurant as having a "New Orleans feel with wrought iron, copper accents, gas lamps and even a quaint courtyard area giving the feeling that you were sitting in the heart of the French Quarter"; plaintiff notes that all these features are also found at Brennan's restaurant. The plans for the Destin restaurant reflect arched openings on the exterior and arched doorways in the interior, and call for wall sconces and

ceiling lanterns, also features of Brennan's restaurant.
Plaintiff concludes that defendants' use of the "Brennan's" mark
in connection with restaurants offering substantially similar or
identical products and services in an atmosphere substantially
similar or identical to plaintiff's Brennan's restaurant will
certainly mislead customers into believing their restaurants are
associated with, sponsored by or affiliated with Brennan's
restaurant in New Orleans.

For their part, defendants admit their products and services
will be similar to those provided by Brennan's.  They admit their
restaurants will feature a "traditional New Orleans style
cuisine," in an "upscale atmosphere," with decor reminiscent of
the French Quarter.  Yet they note that there are hundreds if not
thousands of upscale restaurants offering New Orleans style
cuisine in a New Orleans style atmosphere, so that Brennan's
obviously has not cornered this market.  They point out that
numerous restaurants serve the same or similar items to those on
the Brennan's menu, and in fact, many of the Brennan family
restaurants have a significant number of menu items that are the
same or similar to those on plaintiff's menu, including, among
others, Bananas Foster (which has obviously become a "classic New
Orleans dessert"), Turtle Soup, Grillades and Grits, Shrimp
Remoulade and Oysters Rockefeller.  Finally, they note that most,
if not all, of the features which plaintiff claims defendants have

17

copied from Brennan's restaurant are hardly distinctive but rather are common throughout the French Quarter.  In fact, in his testimony, Ted Brennan acknowledged that "quite a few" French Quarter buildings have wrought iron or decorative ironwork; that the French Quarter has "quite a few" stucco structures; that gas lanterns are "part of the charm of the French Quarter;" that copper is not uncommon either; that arches abound; and that all of these features are part of the French Quarter theme.  Courtyard dining is also a mainstay of the French Quarter, and is typical of "New Orleans style" dining.

There are undeniable similarities between Brennan's and defendants' planned restaurants; but these same similarities exist between defendants' restaurants (and Brennan's restaurant) and countless other New Orleans/French Quarter restaurants, including restaurants operated by other Brennan family members; and while the court does not doubt that defendants have tried to create a restaurant with the "look" and "feel" of a classic French Quarter fine dining establishment, the court is not persuaded that defendants have replicated Brennan's, at least not to an extent that would likely cause confusion by patrons or potential patrons.

4.  The identity of purchasers/customers:

Of course, as the court has noted, the parties are really not in direct competition for customers, because no one is going to choose on a given day between dining in Jackson/Ridgeland/Destin

or New Orleans.  Brennan's contends, however, that because its "sphere of influence" extends at least throughout the southeast so that its customer base includes diners in the Jackson/Ridgeland and Destin areas, defendants' infringing actions will reduce Brennan's market.  Brennan's posits that customers in Jackson or Destin may choose to forego a trip to New Orleans if they believe they can eat at Brennan's in Jackson or Destin, or if they travel to New Orleans, may choose to forego eating at Brennan's, thinking they have or can do so in Jackson or Destin.

However, another "digit of confusion" that the court may consider is the degree of care employed by consumers, or put another way, the sophistication of the potential customer.  In this regard, it is undoubtedly true that both parties cater to sophisticated patrons who are far more likely to appreciate the distinction in the parties' restaurants, and to understand they are under separate ownership, which significantly lessens the likelihood of confusion.

5.  Identity of advertising media:

While plaintiff and defendants use similar advertising media in their markets, the court tends to agree that in light of the geographic distance involved, there is little likelihood that their advertising might tend to mislead a prospective patron.

6.  The defendants' intent:

"Proof of an intent to confuse the public is not necessary to a finding of a likelihood of confusion," but proof that "a mark was adopted with the intent to confuse the public . . . alone may be sufficient to justify an inference of a likelihood of confusion."  Elvis Presley Enterprises, 141 F.3d at 203.

Plaintiff argues that defendants' intent is clear:  They "seek to capitalize and profit on confusion of Defendants' restaurants with the BRENNAN'S RESTAURANT by name association and similarity of restaurant services provided," that is, by "replicating BRENNAN's Restaurant while using an infringing mark."

The court is not persuaded that defendants selected the mark "Clark and Blake Brennan's Royal B" for the purpose of creating confusion.  These defendants simply wanted to use their own names on their own restaurants, and undertook to do so in a way they thought (or at least hoped) would satisfy plaintiff's objections to their use of the Brennan name.[11]  In so doing, defendants relied on earlier agreements between Brennan's, Inc. and other members of the Brennan family prescribing allowable use of the "Brennan's" mark, including a 1979 agreement with Owen Brennan, Sr.'s brothers and sisters and their heirs, and a 1998 agreement with Dickie

---

[11]   The court notes, but rejects, plaintiff's arguments that defendants alleged misplacement of the apostrophe in "Clark and Blake Brennan's Royal B," reflects an intent on the part of defendants to suggest a connection with Brennan's, for while plaintiff may find the point debatable, it appears to the court that defendants' mark is grammatically correct.

Brennan.  The stated purpose of those consent-to-use agreements was to delineate acceptable uses of the mark toward the goal of avoiding confusion of the trade or public,"[12] and both agreements provided that the other Brennan family members could use the Brennan name so long as they adhered to certain defined criteria, namely, that one or more of the first names would always be used in connection with the Brennan surname as the restaurant name; the first name would always be of at least equal prominence with the surname Brennan; no name would appear in script form; and no connection or association could be made or suggested between the new restaurant and Brennan's, such as by use of the words "original" or "famous."  Although defendants are not parties to either of those agreements and thus cannot claim to be contractually permitted to use the "Brennan's" mark,[13]

---

[12]   A consent-to-use agreement is a contract in which the owner of a mark consents to another party's defined use of the mark and, in effect promises not to sue so long as the other party keeps within the defined zone of use.  Brennan's, Inc. v. Dickie Brennan & Co. Inc., 376 F.3d at 364 (citing 2 McCarthy on Trademarks and Unfair Competition § 18:79 (4th ed. 2004)).  "That is, [the owner] admits that such defined usage is not an infringement and that [he] will therefore not sue [the other party] for such usage."  Id.  "In other words, a consent-to-use agreement '"[i]s not an attempt to transfer or license the use of a trademark ... but fixes and defines the existing trademark of each ... [so] that confusion and infringement may be prevented."'"  Id.

[13]   Defendants have argued that plaintiff is foreclosed from asserting a claim for infringement because their mark complies with the requirements of the 1979 and 1998 agreements.  In Brennan's, Inc., the Fifth Circuit declined to decide whether a stranger could rely on a consent-to-use agreement, stating:

nevertheless, it does appear they relied on the agreements'
provisions in choosing their own "Clark and Blake Brennan's Royal
B," which suggests to the court that they did not adopt their own
mark with an intent to confuse.[14]  Moreover, especially given that
defendants were aware that most of the other Brennan family
restaurants were traditional New Orleans/French Quarter style
restaurants, the fact that their plan was to also open restaurants
where they would offer "authentic New Orleans cuisine in a
meticulously reproduced classic New Orleans style 'French Quarter'
setting," i.e. cuisine similar to that of Brennan's in a setting

---

We point out that the defendants do not raise the
theory, adopted by some courts but not by others, that a
stranger to a consent-to-use agreement can use the
agreement against the mark-holder as an admission that
certain uses do not create confusion, though other
courts reject such a theory.  See 2 McCarthy § 18:81.
In terms of the facts of this case, the argument would
be that the plaintiffs' consent to let Dickie use
certain names could be turned against the plaintiffs if
they brought an infringement case against other parties
for similar conduct, on the theory that even strangers
to the consent-to-use agreement could use the
plaintiffs' contract with Dickie as an admission that
such uses do not produce confusion.  Since the
defendants have not raised this particular theory in
their brief in defense of either the companies or
Richard Sr., we accordingly express no opinion on
whether such a theory is a viable defense in an
infringement suit.
Brennan's Inc. v. Dickie Brennan & Co. Inc., 376 F.3d at 369 n.7.

[14]  Plaintiff argues that intent is evident from the fact
that defendants "intentionally decided to use the name 'Clark and
Blake Brennan's Royal B' for their proposed restaurant venture."

similar to Brennan's, does not lead to the court to find an intent
to confuse.

"However, an innocent intent in adopting a mark does not
immunize an intent to confuse in the actual use of the mark."
Elvis Presley Enter., 141 F.3d at 203 (citing *Restatement (Third)*
*of Unfair Competition* § 22 cmt. c (1995) ("Even if an actor
believes in good faith that the copying of another's designation
is justified, an inference that confusion is likely may arise from
other circumstances that suggest an intent to confuse, such as a
failure to take reasonable steps to minimize the risk of
confusion.")).

Although the court does not view the evidence as
demonstrating an intent to confuse in the formative stages of
defendants' venture, there is evidence in the record that could be
viewed as suggesting an intent to confuse.  To the point, in a
press release in reference to defendants' planned Ridgeland
restaurant, Clark Brennan was quoted as saying, "[I]t is in our
blood to give phenomenal food and service and to provide the best
possible dining experience our patrons have come to expect."
Given the Brennan *family's* fame as restaurateurs, it would not
have been misleading, or have implied a connection to Brennan's,
merely to have said it was in defendants' blood to provide
phenomenal food and service.  However, the reference to "our
patrons" could not have been a reference to Clark and Blake's

23

"patrons" because they had no patrons; he was, instead,
necessarily referring to Brennan's patrons, and thus his statement
in this regard, in what was essentially an advertisement for the
restaurant, implied a connection to Brennan's.  This is the only
comment attributed to either defendant which could fairly be said
to amount to an affirmative suggestion of a link between the
parties' restaurants.[15]  However, while plaintiff obviously
disagrees, the court does not consider this comment, though
careless, to have been calculated or intended to confuse or
deceive.[16]

_____

[15]    Plaintiff also cites to an article in Jackson VIP
magazine which included the same quote regarding "our patrons,"
and which stated of Clark and Blake Brennan that
     [t]hey come from a long line of restaurant owners in the
     Crescent City and are now bringing their expertise to
     the metro area.
          "Expanding a new concept has been in the planning
     mode for quite some time, but due to Hurricane Katrina,
     the opportunity to act on those plans has risen to the
     forefront," Blake Brennan said.
          Their Royal B Restaurant will feature authentic New
     Orleans decor that will have you feeling like you're
     dining in the French Quarter.  And to help you bring
     that feeling home, the Brennans have shared some of
     their signature food and drink recipes.
Plaintiff contends that this reference to Blake and Clark's
"signature food and drink" recipes is really a reference to
Brennan's signature food and drink recipes.  However, neither of
the defendants is reported to have made this reference to their
"signature food and drinks."  That characterization appears
instead to have come from the author of the article.

[16]    Many of the circumstances cited by plaintiff as supposed
evidence of an improper intent relate to the fact that defendants
"secretly" began the process of organizing and planning and
seeking investors for their restaurant venture while still
employed and paid by Brennan's, and while still employed and paid

7.  Any evidence of actual confusion:

"To show actual confusion, a plaintiff may rely on anecdotal instances of consumer confusion, or consumer surveys." Scott Fetzer Co. v. House of Vacuums Inc., 381 F.3d 477, 486 (5th Cir. 2004).  Brennan's has not offered survey evidence; rather, it has undertaken to show actual confusion through anecdotal evidence, consisting primarily of phone calls and emails to Brennan's by persons who evidently thought, erroneously, that defendants' restaurants were affiliated with Brennan's.

Specifically, plaintiff has offered evidence of the following:  a December 2006 email inquiring about possible employment at the Jackson restaurant; a resume from a gentleman seeking employment at the Destin restaurant; a call log prepared by Candice Darce, a Brennan's hostess, reporting an April 5, 2007 call from a lady asking for information about the new Brennan's

---

by Brennan's, had "secretly" formed and begun acting on their plan to open and operate restaurants "offering authentic New Orleans cuisine in a meticulously reproduced classic New Orleans style 'French Quarter' setting."  Plaintiff submits that these acts of the defendants clearly indicate an intent to deceive.  See Blue Bell Bio-Medical v. Cin-Bad, Inc., 864 F.2d 1253, 1258 (5th Cir. 1989) (holding that an intent to deceive or profit from confusion may be inferred from the acts of the infringer).  However, the issue is not whether defendants intended to deceive their uncles/employer, but whether their actions suggest an intent to deceive prospective customers.  No such intent could reasonably be inferred from the mere fact that defendants (who, the court would note, were at no time encumbered by any covenant not to compete) were positioning themselves to start their new venture even before they resigned from Brennan's.

restaurant,[17] an April 5, 2007 call from a gentleman inquiring about employment at the Jackson restaurant; an April 17, 2007 call from a lady asking if she could book a party at the Destin restaurant; an affidavit and testimony from Sandra Taylor, sales manager for Brennan's regarding a call from a gentleman requesting information regarding the restaurants in Destin and Ridgeland and an email from someone with the mayor's office in the City of Madison regarding Brennan's "other site locations;" testimony from Diane Miller regarding a call from a gentleman in Gulfport, Mississippi who said he had received a request for a quote from Clark Brennan on some restaurant equipment and who wanted to know whether Brennan's was opening a restaurant in Gulfport; and testimony from Bonnie Warren, Brennan's public relations consultant, regarding two phone calls she received from media outlets in Destin asking whether Brennan's would be interested in advertising for the new Destin restaurant.

Defendants characterize these inquiries as suggesting more "curiosity" than confusion, and note that evidence of mere curiosity, as opposed to actual confusion, is properly accorded little weight:

---

[17]   The log regarding this particular call reflects that in response to Ms. Darce's having informed the caller that the new restaurants were not affiliated with Brennan's, the woman responded, "Oh, another family tiff."  This is yet another indication that the Brennan family's schism which has resulted in Brennan's restaurants under different ownership is well known.

> A common type of evidence purporting to show confusion
> involves inquiries by customers or others about whether
> there is an affiliation or other relationship between
> the parties.  Such inquiries, being ambiguous, are often
> given little or no weight in themselves or even combined
> with other evidence, at least as to the source of
> confusion.

R. Kirkpatrick, <u>Likelihood of Confusion in Trademark Law</u> § 7.5

(2006).  Moreover, "relevant confusion is confusion is that which

affects 'the purchasing and selling of goods or services in

question;'" <u>Lang v. Retirement Living Publ'g Co.</u>, 949 F.2d 576 (2d

Cir. 1991) (citing Restatement, § 2, "trademark infringement

protects only against mistaken purchasing decisions and not

against confusion generally").  About all plaintiff has shown here

is only that a few curious people have inquired about defendants'

proposed restaurants; this is not the kind of evidence of "actual

confusion" that is the concern of trademark law.

Furthermore, anecdotal evidence of confusion can be relevant

only where there is competent evidence to connect the cited

instances to some representation by defendants.  <u>See</u> <u>Scott Fetzer</u>,

381 F.3d at 487.  "To prove infringement, [plaintiff] must

ultimately prove that a misleading representation by [defendants],

as opposed to some other source, caused a likelihood of

confusion."  <u>Id</u>.  In other words, there must be proof that

defendants are the source of the alleged confusion.  Here, the

evidence is that two members of the Brennan family have announced

they are opening a restaurant, which they have identified as

27

"Clark and Blake Brennan's Royal B."  Given that defendants are
members of the Brennan family and have announced their plan to
open restaurants in these locations, it is understandable that
some members of the public would be curious, and would perhaps
assume there is or may be some affiliation between defendants'
planned restaurants and Brennan's; but the fact that some members
of the public, in advance of the opening of any such restaurant by
defendants, may have made such an assumption, would bear little on
the issue of actual confusion.  There is nothing to indicate that
the calls or emails were caused by any misrepresentation by
defendants.  As such, plaintiff's anecdotes would not be
sufficient, without more, to permit a reasonable finding that
defendants caused the cited instances of confusion.  See id.

     8.  Any other factors bearing on the likelihood of confusion:

     Defendants point out that while their application for the
mark "Clark and Blake Brennan's Royal B" has not been approved or
allowed for publication, the trademark examiner has found "no
similar registered or pending marks that would bar the
registration under the Trademark Act.  Defendants contend, and
plaintiff does not dispute that this means the examiner, after
conducing a search and reviewing the results, determined that
defendants' proposed mark is not confusingly similar to
"Brennan's."  This is a factor that detracts from plaintiff's
request for relief.

However, in the court's opinion, the most significant factor, and it is compelling, is the fact that not only are there so many Brennan family restaurants operating in New Orleans and beyond, but that with the sole exception of Dickie Brennan's Steakhouse, plaintiff does not claim to have experienced confusion, or other than minimal confusion, or any corresponding loss of goodwill or reputation from the other restaurants, notwithstanding that so many of them are in close proximity to Brennan's.  In his testimony, Ted Brennan took the position that there are other reasons these restaurants do not cause confusion, including the facts that some of them (e.g. Palace Café and Bourbon House) had gained their reputations long before the Brennan name was appended to them; and also the fact that unlike defendants' restaurants, these restaurants do not try to replicate Brennan's.  However, the lack of confusion cannot be explained on these bases alone, and certainly not as to all the restaurants.  Moreover, there is a Brennan's of Houston, which was specifically intended as a takeoff on the New Orleans Brennan's, and yet Jimmy Brennan could think of no confusion created by this restaurant.  Ted Brennan indicated that people are occasionally confused about the Houston restaurant, but it has not detracted in the least from the reputation or goodwill of the original New Orleans Brennan's.

There was testimony, primarily from Ted Brennan, that there has been confusion of "biblical proportions" from Dickie Brennan's

Steakhouse.  However, because without including the Brennan's
reference to this particular restaurant, it would be simply
"Steakhouse," which would be essentially meaningless in trying to
identify the restaurant to which one is referring.  Moreover, the
confusion that exists with respect to Dickie Brennan's Steakhouse
relates to reservations being made at one or the other restaurants
and people showing up at that the wrong restaurant, something that
would tend to occur primarily because these restaurants are within
a couple of blocks of each other.  That would simply not be
possible with restaurants hundreds of miles apart.

In sum, it is clear and undisputed that with the exception
noted, the presence of these Brennan family restaurants within
plaintiff's claimed "sphere of influence" has not caused
confusion; Brennan's is thriving, as it seems are all the Brennan
family restaurants.  There is no reasonable basis for predicting
that the addition of defendants' Royal B to the Brennan family's
restaurants in the geographically distant Ridgeland and Destin
would have any effect whatsoever on Brennan's reputation or
goodwill or profitability.

"Likelihood of confusion is synonymous with a probability
of confusion, which is more than a mere possibility of confusion."
Westchester Media, 214 F.3d at 663-664.  Here there is a
possibility of confusion, but having considered and weighed the
digits of confusion, as discussed herein, the court concludes that

30

plaintiff has failed to establish a likelihood of proving anything
more than a possibility of limited confusion.  For this reason,
its motion should be denied.  The court would go further and
observe that it is not persuaded that plaintiff has sustained its
burden as to the remaining requirements for obtaining an
injunction.

Irreparable Harm

First, even assuming plaintiff had proven a likelihood of
success on the merits, plaintiff has not established *irreparable*
harm.  Although it is often written that the loss of goodwill can
be difficult to quantify and may warrant a finding of irreparable
harm, it has also been said that the loss of goodwill of a
business "is usually compensable in money damages."  DFW Metro
Line Servcs. v. Southwestern Bell Tele. Co., 901 F.2d 1267, 1269
(5th Cir. 1990).  On the issue of irreparable harm in the context
of a trademark infringement claim, the Ninth Circuit has aptly
observed,

> [C]ommon sense and various authorities suggest that any
> infringement or confusion must pose a threat to the
> business, profits or reputation of the plaintiff in
> order to create a possibility of irreparable harm.  See,
> e.g., 2 J. McCarthy, supra at § 30:18 ("[s]ome courts
> find sufficient irreparable injury to grant a
> preliminary injunction in a trademark case when
> plaintiff shows that, pending trial, it will lose
> control of its reputation because it rests upon the
> quality of defendant's activities as a result of a
> likelihood of confusion of purchasers"); Apple Computer,
> 725 F.2d at 526 ("once Apple demonstrated a likelihood
> of success on the merits [because of likelihood of
> confusion] ... the district court could have reasonably

31

concluded that continuing infringement would result in
loss of control over Apple's reputation and loss of
goodwill"); <u>Playboy Enterprises</u>, 486 F. Supp. at 432
("in determining plaintiff's possible harm, the crucial
question is not how different the magazines may be but
whether there is a danger that plaintiff may lose
control of its reputation as a result of confusion").

<u>Sardi's Restaurant Corp. v. Sardie</u>, 755 F.2d 719, 724-25 (9th Cir.
1985).  Given the lack of evidence that defendants' restaurants
would pose an imminent threat to Brennan's reputation even if some
confusion about their relationship did occur, plaintiff has failed
to establish irreparable harm.  <u>See</u> <u>id</u>. ("Since the burden was on
appellant to demonstrate a realistic possibility of irreparable
harm, and since the possibility of harm was so slight, the trial
court did not abuse its discretion in refusing to issue a
preliminary injunction.").

<u>Balance of Harms</u>:

As for the relative harm to the parties, the court is
convinced that any likelihood of confusion and resulting loss to
Brennan's is slight.  The court does recognize that plaintiff does
not seek to prevent defendants from opening their restaurants
altogether, but merely to prevent them from using the Brennan name
on their restaurants, which plaintiff suggests would not be much
of a burden to defendants at all.  While there is no absolute or
inalienable right to use one's surname in business, regardless of
the likelihood of confusion, there is "an appropriate judicial
reluctance to preclude an individual's business use of his own

32

surname when such is honest and straightforward, with no attempt to confuse the public." <u>Sardi's Restaurant</u>, 755 F.2d at 725 (recognition of a "judicial reluctance" to enjoin use of one's own name factor in analysis of balance of hardships). <u>See also</u> 1 J. <u>McCarthy</u>, <u>supra</u> at § 13:3(D) ("courts are naturally reluctant wholly to forbid a man to do business in his own name and have generally refused to do so.  They have, however, insisted that he take whatever precautions the circumstances require to prevent deception....") (citation omitted).

<u>Public Interest</u>:

Finally, to allow defendants to use their own name on their own restaurants when the probability of confusion is slight or nonexistent would not disserve the public interest.

<u>Conclusion</u>:

Based on the foregoing, it is ordered that plaintiff's motion for preliminary injunction is denied.

SO ORDERED this 23rd day of May, 2007.


                                        /s/Tom S. Lee
                                        UNITED STATES DISTRICT JUDGE